James J. Gold  #80100
Norma L. Hammes  #80149
Jessica A. Begeman  #264853
GOLD and HAMMES, Attorneys
1570 The Alameda #223
San Jose, CA 95126
408-297-8750 phone
408-297-1189 fax

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:

RICHARD ALAN PIERCE

Debtor

Chapter 13
Case No. 14-5-4584 SLJ

DEBTOR'S OPPOSITION TO MOTION TO DISMISS

    The Debtor, RICHARD ALAN PIERCE, opposes the motion of Pace Supply Corp to dismiss his Chapter 13 case as follows:

**The Substance of the Motion and of the Debtor's Opposition**

    1.    Pace Supply Corp, herein referred to as "Pace," filed a motion to dismiss the Debtor's Chapter 13 case based on its theory that when the correct amount of its unsecured claim (alleged by Pace to be $283,076.22) is considered, the Debtor would be over the unsecured debt limit, herein "debt limit," imposed by 11 U.S.C. §109(e) on Chapter 13 debtors.

    2.    The Debtor opposes Pace's theory. The Debtor's own theory is that when the correct amount of Pace's unsecured claim is considered, believed by the Debtor to be approximately $40,000 (with an uncertainty of around $5,000 or so), the Debtor will be under the debt limit.

1

## A Preliminary Examination of Pace's Proof of Claim

3. Pace filed a proof of claim, Claim No. 12, on February 4, 2015, and amended on February 11, claiming a general unsecured debt owed by the Debtor of $283,076.22, which, if proved and allowed, when included with the Debtor's other unsecured debts would cause the Debtor to exceed the debt limit. Pace's proof of claim, as amended, referred to herein as the "claim," included a second page as supporting documentation. This second page contained two charts:

    A. The first chart listed seven line items in varying amounts from $3,099.93 through $157,713.57, totaled in a column headed "amnt-due." Below these seven lines, surrounded by a box is the sum of the "amnt-due" column, which equals the amount of the claim, $283,076.22. The individual line items appear to be seven construction jobs for which the Debtor purchased supplies from Pace.

    B. The second chart also has seven lines, and appears likely to be a continuation of the first chart showing dollar amounts associated with certain time periods of "current-amnt," "31-60-Days," "61-90-Days," "91-120-Days," and "over-121-days." Each time-period column is totaled on an eighth line with the totals also surrounded by a box.

4. The amounts in the last column, "over-121-days," don't quite equal those in the "amnt-due" column, but the sum of the totals for all five columns is the same as the claim amount, after a small accuracy-related adjustment discussed next.

5. Other than the bottom line totals, with the exception of a single number with transposed digits, the numbers in the first four columns are identical, probably indicating for each month that either interest was charged or some other penalty was assessed on the outstanding balances each month, which is common under contractual arrangements. There are two clear indicators that the documentation sheet supporting Pace's proof of claim is not a normal computer-generated accounting record, but rather an imperfectly hand-generated (or at least an imperfectly hand-copied) document produced especially for Pace's proof of claim:

    A. The first indication of inaccuracies in Pace's proof of claim are those introduced

2

by human fallibility: The cents digits are transposed in the fourth entry in the fourth column, $543.50, which is in other respects identical to the first three columns figures of $543.05, a difference of forty-five cents. Accounting programs do not transpose digits; people do. On the other hand, it should be noted that the bottom-line totals in fact do add up their column's entries, and the fourth total is dutifully summed to $2,031.29, which is forty-five cents higher than the other columns' $2,030.84, so this shows that the person who copied the numbers in the table copied them into a spreadsheet which added the columns correctly. In fact, the sum of all of the column totals on this second table differs from the claim amount by this same forty-five cents.

      B.      The second indication of inaccuracies in Pace's proof of claim are other inconsistencies: As surmised above, the accumulation of identical amounts each month for each of seven line items appears to be the addition of interest charges, or late charges, or some other penalties for non-payment of the amounts due. It is clear from the fact that these numbers do not increase over time that they are not compounded (as in "compound interest") but are each based on an invariant original amount. So, what is strange about the second table showing these additional amounts each month is not their existence, but rather that they do not appear to be related to the amounts originally due in any regular way. Taking the "over-121-days" column as a baseline and assuming some constant multiplier for the charges for each month based on that amount, each line's "interest rate" (for lack of a better term to use) differs from the other line's interest rates. The first line's interest rate is 0.732% per month. The third line's interest rate is 0.826% per month. The other lines' interest rates are between these two, with no two being identical. Now it may be that there is a reason for this, such as each line being subject to a different contractual interest rate negotiated separately, but absent some simple explanation like this, it appears as another indicator of the underlying inaccuracy or proneness to error of Pace's accounting system.

      6.      Now of course Pace will argue that a few cents one way or the other in a quarter-million-dollar proof of claim is a matter of trivialities which should be beneath the notice of the United States Bankruptcy Court. Pace will also argue that using minor arithmetic errors to cast doubt on Pace's entire

3

Case: 14-54584    Doc# 68    Filed: 03/05/15    Entered: 03/05/15 19:11:16    Page 3 of 12

accounting system is an underhanded appeal to the emotions. And if that were the only basis for the Debtor's opposition to Pace's motion, Pace might be correct, but it is not. These easily-demonstrated inaccuracies in Pace's accounting system simply lend additional credibility to the first of the Debtor's three main defenses to Pace's motion, which is that <u>Pace's accounting system allowed one or more people to charge tens of thousands of dollars against the Debtor's account without the Debtor's knowledge, and that Pace's accounting procedures actively prevented the Debtor from being able to detect these fraudulent charges in time to stop any of these fraudulent charges from taking place.</u>

### The Fraudulent Component of Pace's Proof of Claim

7. The Debtor is a plumbing contractor with a business employing approximately fifteen people. As a plumbing contractor, the Debtor would bid for the plumbing component of a construction project, and would contract with the general contractor on the project. For example, a school district may let a contract for rehabilitating an aging school building, and general contractors would bid on the entire project, which would include cement work, carpentry, and plumbing components. The general contractor might have his own employees do the carpentry, and use subcontractors like the Debtor for the cement work, the plumbing, and other specialized activities. As a plumbing contractor, in the Debtor would bid on the plumbing component of the project and if he were awarded the job, in a typical situation, as work progressed, the Debtor would receive progress payments from the general contractor according to his contract with the general contractor, just as the general contractor would receive progress payments under his own contract.

8. In the normal course of business, a subcontractor would have various suppliers of the materials used in the project, and the suppliers would insure that they would be paid by serving notice, a "Notice of Preliminary Lien," on the general contractor and on the owner of the project's land that the supplier is asserting a mechanic's lien on the property being improved by the supplies provided. Ultimately, this mechanics lien acts to secure payment of the supplier from the ultimate beneficiary of the supplies, the landowner, in the event that the contractor or subcontractor defaults on payment for the

4

supplies. Again, in the normal course of business, the supplier receives payment for his supplies, and there is no action on the mechanic's lien. Of course, the mechanic's lien is simply what it's name implies, it does not mean that the subcontractor or general contractor are relieved of any financial obligation for the supplies, but it does mean that the supplier has a secured method of being paid for materials supplied to a construction project.

9. Since 2008, the Debtor has done business with Pace, which has provided the Debtor with plumbing supplies, such as piping, connections, plumbing fixtures, and the like, which the Debtor has installed on various job sites where he has had plumbing contracts. In the course of the Debtor's business relationship, when he has successfully bid on a plumbing contract, he has set up an account for that project with Pace so that the supplies needed would be charged against that particular project. Then, when the Debtor needed supplies, he would telephone Pace with his order and either the Debtor or one of his employees would pick up the order. Alternatively, Pace might deliver an order to a particular job site, depending on the urgency and physical size or weight of the materials ordered.

10. Starting in 2008 and until about two years ago, at the end of each day Pace would fax the Debtor an invoice for any orders placed that day. The Debtor would personally receive these faxes the next morning, and he would personally review each of them to verify that the orders were accurate. Each month Pace would send the Debtor a bill summarizing the month's invoices, and the Debtor would pay the bill. In the normal course of business, the Debtor would submit Pace's bills to the general contractor on the job, and the general contractor would ordinarily write a single two-party check made payable to both Pace and to the Debtor so that the general contractor was assured that Pace was receiving its payment so that Pace would not assert its mechanic's lien for non-payment. For the Debtor's part, as well, this double-signature process provided proof that Pace received its payment.

11. As stated above, up until about two years ago, the Debtor had daily information from Pace regarding every charge made under all of his project accounts because he received faxed copies of every invoice. The Debtor could tell which of his employees had placed the order, and exactly what was ordered. If the Debtor's foreman for an apartment project bought twenty feet of three-quarter-inch steel

5

pipe, the Debtor knew this the next day, and if the foreman bought an electric drill from Pace which he could have bought for less at Home Depot, the Debtor could call him for an explanation within 24 hours of his purchase.

12. Then, about two years ago, the nightly faxes stopped. The Debtor called Pace's Credit Manager, Steve Bilcich, to find out what the problem was. The Debtor explained that he was unable to monitor his expenses without these faxes, and Mr. Bilcich told the Debtor that he would "check into it." The Debtor kept calling him repeatedly and Mr. Bilcich was unable or unwilling to have the daily faxes resume.

13. The Debtor began to be worried because he was not able to find out what he was being charged for. Eventually, Mr. Bilcich told the Debtor that the Debtor could review his invoices online, and the Debtor was provided an internet address for that purpose. When the Debtor tried to access his account, he were unable to do so. The Debtor then telephoned Mr. Bilcich again and again trying to get online access to his billing information, and each time the Debtor was told that someone would call him back with the correct information. The Debtor was not called back, and no matter how much the Debtor tried to get information about his account, he was not able to do so online or in any other way.

14. Then, the Debtor began to notice that his monthly bills were starting to increase from their normal amounts and he tried again to get a breakdown of what the charges were that were included in his bill, without success.

15. Matters came to a head when the Debtor received a bill from Pace for $80,000 on a plumbing job which the Debtor had bid at $52,000. The entire materials bill for that project should have been only about $20,000, and yet it was four times that amount!

16. The Debtor demanded that Pace provide him with his missing invoices, and after several telephone calls, he received a two-inch-stack of copies of invoices from Pace.

17. When the Debtor looked at the invoices that Pace had sent him, he was horrified! Pace had billed one of the Debtor's jobs for sixty-five electric drills totaling $600, which amounted to four electric drills for each of his employees, including clerical staff! Another project was billed for $45,000 of

6

copper piping which was never ordered by or received by the Debtor's company, and so on. There were over $150,000 in bills in that stack of invoices which had absolutely nothing to do with the Debtor or his business, other than the fact that the Debtor is a plumbing contractor and Pace provides plumbing supplies. When the Debtor looked at who had signed for these fraudulent transactions, none of the names were the Debtor's employees or himself. The Debtor was shocked, and met with Mr. Bilcich and showed him what had happened. Mr. Bilcich simply suggested that the Debtor file bankruptcy.

18. The Debtor has always understood that he was responsible for paying for the purchases which he and his business made from Pace, but he is not responsible for paying for someone else's purchases, regardless of whether Pace chose to charge them to the Debtor's account or not.

19. If the Debtor had continued to receive daily invoices for charges to his account as he had for about five years, he would have spotted the very first fraudulent transaction and both Pace and the Debtor would be the better for it.

20. The Debtor blames Pace for stopping its daily invoice faxes and then refusing to replace them with something equivalent. Pace left itself open to being defrauded and in spite of the Debtor's protests, Pace removed the Debtor's ability to monitor his account. The Debtor cannot be held responsible for fraud which the Debtor had no way of detecting until it amounted to tens of thousands of dollars.

21. As stated above, as soon as the Debtor suspected that there was a problem, he contacted Pace and he demanded the detailed invoice statements which Pace had stopped sending him. And as soon as the Debtor saw what the problem was, he went to Pace and showed Mr. Bilcich the evidence in form of the fraudulent invoices.

22. The Debtor does not know who is responsible for the huge bill which Pace demanded that he pay, all the Debtor knows is that he is not responsible for incurring it or paying it. Throughout this explanation, it is assumed that Pace actually filled the orders for which the Debtor was being billed by delivering goods to somebody, but the Debtor has no idea who that might be. All the Debtor knows about these transactions is that he was not a party to them.

7

## The Secured Component of Pace's Proof of Claim

23. The Debtor's second defense to Pace's motion to dismiss his Chapter 13 case is that to the extent Pace has a claim, only those parts of Pace's claim which are not secured by one of Pace's mechanics' liens would be an unsecured claim.

24. Referring to the tables on the second page of Pace's proof of claim, this would be the fifth line-item which is labeled "PIERCE PLUMBING" with "cust#" of "31024-00" in the amount of $19,229.86. All of the other line items have individual project designations of "PIERCE PLBG / " followed by their project designation ("SAN FRANCISCO USD," "BAMDAD RESIDENCE," "CVS STORE," "MONTAGUE POINTE," "ANDERSON BAKERY," and "FAMILY RESTROOM") and would be secured by individual mechanics liens on their respective real properties. This mechanics lien serves as a lien not only on the real property, but on the funds paid by the property owner to be received by the general contractor and in turn on the funds received by the Debtor from the general contractor.

25. As such, to the extent that Pace is owed for supplies for properties on which it has a mechanics lien, Pace is secured by the accounts receivables owed to the Debtor for those projects. The two-party check payment procedure described above is set up to assure that Pace will be paid on its secured claim, and in fact Pace has probably already been paid for some of the Debtor's projects.

## A Portion of Pace's Claim is a Contingent Debt of the Debtor

26. The Debtor's third defense to Pace's motion is exemplified by the process of payments to Pace through two-party checks.

27. Inherent in the two-party check method of payment for Pace is that Pace does not receive these funds from the Debtor. Pace receives its funds directly from the general contractor's bank account in the form of a check issued on the general contractor's bank account on which the Debtor places his signature acknowledging and approving the transfer of the funds into Pace's bank account. The Debtor, serves only as an intermediary for the general contractor's check, which is a negotiable instrument. The Debtor at no time has access to these funds or control over these funds, or any other rights or obligations regarding them.

8

28. It is true that in the event of non-payment by the general contractor or the landowner and the failure of Pace's mechanic's lien to cover Pace's obligation for supplies used on the landowner's premises, the Debtor may have an obligation to pay Pace, but in the usual situation, the Debtor's obligation is only to act as a conduit for the check drawn on the general contractor's account.

29. Of course, to the extent that Pace's bill for a project includes components which are not for supplies for that project, such as the fraudulent parts of Pace's claim, these fraudulent components would not be secured by the mechanic's lien and would not be part of Pace's secured claim. But these fraudulent components are not amounts even owed by the Debtor in the first place, so they would not give rise to an unsecured claim either.

**The Bankruptcy Court has a Duty to Examine Claims for Fraud and Inaccuracy**

30. In the case of *Pepper v. Litton*, 308 U.S. 295 (1939), at 303, while that case dealt with issues irrelevant here (Litton's fraud in the creation of his claim against his own company in an attempt to prevent a payment to Pepper), the United States Supreme Court clearly stated the broad equitable power of the United States Bankruptcy Court to examine claims:

> Courts of bankruptcy are constituted by 1 and 2 of the bankruptcy act 30 Stat. 544, 11 U.S.C.A. 1(8), 11, and by the latter section are invested 'with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings.' Consequently this Court has held that for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'. Local Loan Co. v. Hunt, 292 U.S. 234, 240 , 54 S.Ct. 695, 697, 93 A.L.R. 195. By virtue of 2 a bankruptcy court is a court of equity at least in the sense that in the exercise of the jurisdiction conferred upon it by the act, it applies the principles and rules of equity jurisprudence. Larson v. First State Bank of Vienna, S.D., 8 Cir., 21 F.2d 936, 938. Among the granted powers are the allowance and disallowance of claims; the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the provisions' of the act. In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts. United States Fidelity & Guaranty Company v. Bray, 225 U.S. 205, 217 , 32 S.Ct. 620, 625.
>
> The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. By reason of the express provisions of 2 these equitable powers are to be exercised on the

9

allowance of claims, a conclusion which is fortified by 57, sub. k, 11 U.S.C.A. 93 sub. k. For certainly if, as provided in the latter section, a claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case', disallowance or subordination in light of equitable considerations may originally be made.

Hence, this Court has held that a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. Lesser v. Gray, 236 U.S. 70 , 35 S.Ct. 227. And the mere fact that a claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, Boynton v. Ball, 121 U.S. 457 , 7 S.Ct. 981, so the court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. Wetmore v. Markoe, 196 U.S. 68 , 25 S. Ct. 172, 2 Ann.Cas. 265. It may ascertain the validity of liens, marshal them, and control their enforcement and liquidation. Isaacs v. Hobbs Tie & Timber Company, 282 U.S. 734 , 51 S.Ct. 270. And the bankruptcy trustee may collaterally attack a judgment offered as a claim against the estate for the purpose of showing that it was obtained by collusion of the parties or is founded upon no real debt.

31. Of course much has happened since 1938 when Pepper v. Litton was decided, and all of its statutory references are to the pre-1978 Act, but the fundamental point being made here is that the Bankruptcy Court not only has the power, but it has the duty to examine Pace's Proof of Claim carefully to assure that only those specific charges which were for purchases made by the Debtor are included in Pace's allowed claim.

**The Debtor Will Object to Pace's Proof of Claim to Remove Fraudulent and Paid Amounts**

32. Within the next few days, prior to the hearing on Pace's motion to dismiss his case, the Debtor will file an objection to Pace's Claim 12.

33. The basis for the Debtor's objection will be:

A. All amounts within Pace's proof of claim for the fraudulent sales not made to the Debtor should be disallowed;

B. All amounts within Pace's proof of claim which are subject to each of Pace's mechanic's liens should be reclassified as secured by those liens, and allowed to be paid from the proceeds of those projects by which they are secured; and

C. All amounts actually paid by the Debtor to Pace prior to the filing of his bankruptcy petition which were for fraudulent sales which were not made to the Debtor should be

10

offset against the remaining amount in Pace's proof of claim and thereby reduce Pace's claim by those over-paid amounts.

### Procedural Suggestion

34. It is anticipated that Pace will request a hearing on the Debtor's objection to its claim and also that before an evidentiary hearing can be held, the Debtor will need more documentary evidence from Pace regarding his account.

35. The type of evidence the Debtor needs from Pace relates to the amounts the Debtor paid Pace for fraudulent sales prior to the Debtor discovering the fraud. The stack of invoices the Debtor was provided by Pace does not address this issue.

36. Accordingly, the hearing on March 19 should be considered a status conference so that the Court and the parties can establish a procedure for resolving the issues raised by Pace's motion and by the Debtor's objection to Pace's claim.

### Conclusion

37. As noted above, Pace's proof of claim, itself, shows that Pace's accounting system allows inaccurate statements of fact to be made. Whether the inaccuracy in Pace's accounting system is forty-five cents or forty-five thousand dollars is merely a matter of which digits are transposed, and an accounting system which allows one transposition cannot claim to be free from others.

38. Pace has made a very serious charge, to wit: that the Court should not allow the Debtor the protection of his Chapter 13 case while he reorganizes. Pace's allegations should be dealt with seriously and the Debtor must be allowed to refute them in a fair and dispassionate evidentiary hearing.

Respectfully Submitted,

Dated: March 5, 2015

GOLD and HAMMES,
Attorneys for the Debtor

11

Case: 14-54584   Doc# 68   Filed: 03/05/15   Entered: 03/05/15 19:11:16   Page 11 of 12

James J. Gold, #80100
Norma L. Hammes, #80149
Jessica A. Begeman, #264853
GOLD and HAMMES, Attorneys
1570 The Alameda #223
San Jose, CA 95126
(408) 297-8750
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:

Richard Alan Pierce

Debtor
_____/

Chapter 13
Case No. 14-5-4584 SLJ

CERTIFICATE OF SERVICE RE
DEBTOR'S OPPOSITION TO MOTION TO DISMISS

I, the undersigned, declare that I am employed in the County of Santa Clara. I am over the age of 18 years and not a party to the within entitled action. My business address is 1570 The Alameda, Suite 223, San Jose, California.

On March 5, 2015, I served the within DEBTOR'S OPPOSITION TO MOTION TO DISMISS by placing a true copy thereof in a sealed envelope with postage thereon prepaid in the United States Mail at San Jose, California, addressed as follows:

    Michael C. Fallon
    100 E Street, #219
    Santa Rosa, CA 95404

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on March 5, 2015, at San Jose, California.

Dated: March 5, 2015